IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

| | | |
|---|---|---|
| ARKANSAS METHODIST HOSPITAL<br>CORPORATION d/b/a/ Arkansas<br>Methodist Medical Center, | * * * * | |
| Plaintiff, | * * | |
| vs. | * * | No. 3:04CV00362 SWW |
| CRAIG W. FORBES, M.D., | * * | |
| Defendant. | * | |
| | | |
| ARKANSAS METHODIST HOSPITAL<br>CORPORATION d/b/a/ Arkansas<br>Methodist Medical Center, | * * * * | |
| Plaintiff, | * * | |
| vs. | * * | No. 3:04CV00363 SWW |
| EUGENE M. FINAN, M.D., | * * | |
| Defendant. | * | |

**Memorandum Opinion and Order**

Before the Court are plaintiff's motions for summary judgment to which defendants have responded and plaintiff has replied. For the reasons stated below, the motions are denied.

**Background**

Plaintiff Arkansas Methodist Hospital Corporation d/b/a Arkansas Methodist Medical Center ("Methodist") owns and operates a hospital in Paragould, Arkansas. In November 2001, defendants Craig W. Forbes, M.D., and Eugene M. Finan, M.D., both signed Recruitment Agreements with Methodist, whereby they agreed to engage in the specialty of obstetrics and gynecology ("OB/GYN") on a full time basis in Paragould. In exchange, Methodist agreed to advance them money in the form

of an "Income Guarantee Loan."  Under the terms of the contract, the doctors are obligated to repay Methodist the total outstanding balance due on the Income Guarantee Loan, except as otherwise provided by the contract.  If the contract is terminated for any reason other than Methodist's breach or the doctor's death or disability, the entire outstanding balance of the Income Guarantee Loan is due and payable immediately and in cash upon demand by Methodist.  Under the terms of the contract, Methodist was obligated to forgive 1/48 of the outstanding balance of the loan for each month that the doctor remained in Paragould as an appointee of Methodist's medical staff, during the period beginning three months after the conclusion of the guarantee period.

Dr. Forbes signed his contract on or about November 16, 2001.  Dr. Finan signed his contract on or about November 12, 2001.   On or about October 17, 2002, both Drs. Forbes and Finan agreed to amend their contracts so as to extend the contract's "guarantee period" for an additional year, thereby entitling them to borrow more money from Methodist.

Methodist performed all of its obligations under the contract.  On or about June 25, 2004, Forbes ceased to be a member of Methodist's medical staff, and ceased practicing medicine in Paragould, thereby defaulting on the contract.  Dr. Finan ceased being a member of Methodist's medical staff and ceased practicing medicine in Paragould on or about August 1, 2004.  On or about September 9, 2004, Methodist notified Drs. Forbes and Finan in writing that they had committed "events of default" specified in the contract, and that they had potentially committed other, then unknown, events of default.  Methodist further notified Drs. Forbes and Finan of its decision to terminate the contracts and demanded immediate payment of the total outstanding balance of $529,399.13 owed by Dr. Forbes to Methodist under the contract, and $388,553.64 owed by Dr. Finan.

Both defendants have refused to repay Methodist the total amounts due under the Income Guarantee Loans.

On September 10, 2004, and September 14, 2004, Methodist filed complaints against Drs. Forbes and Finan, respectively, in state court, alleging breach of contract and unjust enrichment.[1] The doctor defendants separately removed the actions to federal court based upon diversity of citizenship, and filed counterclaims alleging fraudulent inducement and breach of fiduciary duty.[2] The complaints were consolidated for trial, set for the week of November 14, 2005.

Methodist moves the Court for summary judgment on its breach of contract claims and on the counterclaims of fraud, asserting there are no genuine issues of material fact in dispute. Defendants contend genuine issues of fact exist as to whether they were fraudulently induced to sign the recruitment contracts.

## Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts."

---

[1] Because defendants do not dispute the existence of a contract, the Court need not consider Methodist's claim of unjust enrichment.

[2] Defendants have withdrawn their claims of breach of fiduciary duty.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party may not rest on mere allegations or denials of his pleading but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 587 (quoting Fed. R. Civ. P. 56(e)).

"[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995).  The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *Matsushita*, 475 U.S. at 587 (citations omitted).  Further, summary judgment is particularly appropriate where an unresolved issue is primarily legal, rather than factual.  *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir. 1995).

## Discussion

Defendants do not dispute the execution of the contract between themselves and Methodist.  They contend, however, that they are not legally required to honor the terms of the contract because they were fraudulently induced to enter into the contract by representations made by Ron Rooney, the CEO of Methodist.[3]  Methodist argues that defendants failed to plead fraud with specificity as required by Fed.R.Civ.P. 9(b), and that none of the factual averments upon which they base their counterclaim constitutes a false representation of material facts.

---

[3] Originally, defendants also pled the affirmative defenses of failure of consideration, impossibility of performance, and unconscionability (Dr. Forbes).  They have, however, withdrawn those defenses.

**1. Federal Rule of Civil Procedure 9(b)**

Fed.R.Civ.P 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

> This particularity requirement demands a higher degree of notice than that required for other claims. The claim must identify who, what, when, and how. Rule 9(b) is to be read in the context of the general principles of the Federal Rules, the purpose of which is to simplify pleading. Thus, the particularity required by Rule 9(b) is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations.

*United States ex re. Costner v. United States,* 317 F.3d 883, 888 (8th Cir. 2003).

Paragraph 6 of Forbes' and Finan's counterclaims contain their allegations of fraud:

> That during the recruitment process, the Plaintiff, acting through its agents and employees, made false statements of fact to the Defendant. Such statements included without limitation representations and projections about the type of patients that he could expect to have, the referrals to his practice that he could anticipate and expect, the need for physicians with training and experience in the medical specialty of obstetrics and gynecology, and the income he could be expected to receive.[4]

Methodist argues that nothing in the counterclaims indicates who made the alleged statements, when they were made, where they were made, or even what the statements were. In response, defendants argue this is not a complicated case, and when read in the context of the general principles of the Federal Rules of Civil Procedure, their allegations comply with Rule 9(b). In addition, they complain that Methodist should have "played fair" and given them a chance to amend their pleadings if Methodist sincerely did not know the circumstances behind defendants' allegations of fraud.

---

[4] *See* Forbes Counterclaim, docket entry 13 in Case No. 3:04cv362 SWW, and Finan Counterclaim, docket entry 12 in Case No. 3:04cv363 SWW.

"The degree of particularity required to comply with Rule 9(b) varies from case to case: The sufficiency of a pleading under Rule 9(b) depends upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading." *McDonnell Douglas Corp. v. SCI Technology, Inc.,* 933 F.Supp. 822, 825 (E.D.Mo. 1996). The Court finds that when read in conjunction with the principles of notice pleading, and given the context in which the fraud is alleged to have occurred, the counterclaims meet the requirements of Rule 9(b). Plaintiff Methodist sued Drs. Forbes and Finan over Recruitment Agreements the parties negotiated. Defendants allege that during the recruitment process, agents of Methodist made false representations concerning certain specific matters, e.g. type of patients, referrals, need for OB/GYNs. Paragraph 6 provides Methodist with enough detail to give it adequate notice to prepare a responsive pleading.

**2. Fraud**

The essential elements of fraud are (1) false representation of a material fact; (2) knowledge that the representation was false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance. *Goforth v. Smith,* 991 S.W.2d 579, 586 (Ark. 1999). Drs. Forbes and Finan state that their claims for fraudulent inducement are based principally upon two alleged representations made by Rooney: 1) that Dr. Norman Smith, another OB/GYN in Paragould, would be leaving; and 2) that the percentage of Medicaid OB/GYN patients in Paragould traditionally was very low but because of Dr. Smith's personal problems and reputation, the percentage had increased. They say Rooney told them that the

"good" patients were going to nearby Jonesboro for treatment, but that once the two new doctors got to Paragould, the percentages would return to their favorable level.

There had been two OB/GYNs practicing in Paragould during the relevant time period: Dr. Smith and Dr. Spencer Colby. When Colby left the practice in 2000 to return to his home state of Utah, Methodist began recruiting his replacement. Dr. Forbes, who was practicing in St. Mary's, Ohio, testified that when one of the hospitals in the area recruited another OB/GYN, he decided he would sell his practice and move. He learned of the position in Paragould from a mailing, and considered other opportunities, including one in Hot Springs, Arkansas, and one in Texarkana. Dr. Finan was practicing in Brownsville, Tennessee, and when the hospital there decided to stop delivering babies, he determined he would have to move. He testified that one of the reasons he moved to Paragould was to be near his wife's parents. Dr. Finan said he contacted Ron Rooney and asked if Methodist was interested in having another obstetrician in town. Mr. Rooney put Finan in touch with Smith. According to Finan, Smith said he was interested and that he would send Finan some material, but he never did.

Dr. Finan said after further attempts to contact Smith were unsuccessful, he contacted Rooney sometime in 2001. According to Finan, Rooney told him Smith was not interested in a practice partner but Methodist was interested in getting another OB/GYN in town. Mr. Rooney visited Finan in Tennessee. After that visit, Finan, who grew up and attended college and medical school in Arkansas, called two physicians in Paragould with whom he was acquainted. He said Dr. Bennie Mitchell told him if he wanted to have a successful practice, Finan could not be associated with Smith. Dr. Mitchell also confirmed that family practice physicians in Paragould thought they needed another OB/GYN in town. Dr. Finan said that Dr. Larry Lawson told him Smith had a problem with alcohol and had been

7

arrested in Missouri for firearms possession. Dr. Finan said Rooney told him Smith was leaving, and after Finan made the decision to come to Paragould, he and his wife met with Smith. He said Smith told them about his problems and told Finan he did not want him in Paragould and would do everything he could to keep Finan from having a successful practice. Dr. Finan testified that based upon his conversation with Rooney, he thought Smith was leaving. He said that at the end of his first year in Paragould, when he renewed his contract, Methodist continued to insist that Smith was leaving. While he had heard rumors that Smith was leaving, Finan said Rooney represented that he knew for a fact that Smith was going to be leaving town.

Dr. Forbes testified that when he came to Paragould for an interview, Rooney told him that Smith, the only OB/GYN in town, had had some difficulties and was going to be leaving. Methodist had recruited Finan and needed to bring in another OB/GYN. He said Rooney told him Smith had been arrested, that there had been some drug charges and gun charges, and there were substance abuse concerns. Dr. Forbes testified that he thought it was reasonable for Rooney to think Smith might be leaving.

Drs. Forbes and Finan contend that Methodist knew Smith was not leaving, and in spite of that, determined to recruit two new OB/GYNs. They point to minutes from a hospital board meeting on October 15, 2001, during which Rooney reported to the board that Smith was "having second thoughts" about the need for another OB-GYN because his patient volume had "decreased significantly over the last year."[5] Minutes from a Physician Recruitment Committee meeting on October 26, 2001, show that Rooney reported that Smith had changed his position on recruiting a partner. Later in the

---

[5]Forbes' Br. in Supp. of Resp. to Mot. Summ. J., Ex. A.

meeting, Smith made a personal appearance and informed the Committee that his practice volume was down 42%, that he had laid off two employees, and that he did not need a partner "right now." Nevertheless, the Committee voted to continue the recruitment activities.[6] As reflected in the November 19, 2001 board minutes, Methodist's goal was to "rebuild and maximize [the] OB-GYN services" at the hospital.[7]

Defendants assert that in order for Methodist to accomplish its recruitment goals, Rooney repeatedly told them that Smith was leaving Paragould. Dr. Forbes testified Rooney told him Smith was going to be leaving.[8] Dr. Finan testified that from the time they talked in Brownsville until November of 2003, Rooney said Smith was leaving. He said Rooney could not talk about how he knew because it was confidential.[9] Dr. Finan testified "everybody heard rumors" about Smith but that Rooney represented that he knew for a fact that Smith was going to be leaving town.[10] Mrs. Finan testified that Rooney told her and her husband that Smith was leaving and that it was confidential.[11] Dr. Forbes testified that at the time he was preparing to renew his contract, Rooney told him there were "things going on that we just can't talk about."[12] He said there were rumors then that Smith was moving to St. Louis, and other physicians in town felt it was a possibility, but no one stated it as

---

[6]*Id.,* Ex. B.

[7]*Id.*, Ex. C.

[8]Pl's. Mot. Summ. J., Ex. 1 at 57, 63 (Forbes' Dep.)

[9]Pl's. Mot. Summ J., Ex. 1 at 62-64, 70 (Finan Dep.)

[10]*Id.* at 72.

[11]Forbes' Br. in Supp. of Resp. to Mot. Summ. J., Ex. F at 78.

[12]Pl's. Mot. Summ. J., Ex. 1 at 99 (Forbes' Dep.)

unequivocally as Rooney.[13] For his part, Rooney testified that he told Drs. Forbes and Finan that there was no guarantee Smith was going to leave.[14] He said he got the feeling from defendants that they wanted him to say Smith was leaving, but he "wanted to make sure that they knew that I could not give them any guarantee that Dr. Smith was going to leave."[15]

Drs. Forbes and Finan also assert that Rooney misrepresented the percentage of OB/GYN patients in the Paragould area reimbursed by Medicaid as opposed to self-pay or health insurance.[16] They contend that Rooney told them the percentage traditionally was very low but had gone up solely because of Dr. Smith's personal problems and reputation. According to defendants, Rooney told them all of the "good" patients - those with health insurance - were going to Jonesboro for treatment. This was referred to as a "carriage trade."[17] Mr. Rooney indicated that he felt certain this would change once Drs. Forbes and Finan got there.

Dr. Finan testified Rooney told him the Medicaid reimbursements were less than 25%.[18] Mrs. Finan testified she recalled Rooney telling her and Dr. Finan that the Medicaid reimbursements were between 7 and 11 percent; she said she remembered this because her father had been in the 7-11 grocery business.[19] Drs. Forbes and Finan testified that the percentages of Medicaid patients they saw

---

[13] *Id.*

[14] *Id.*, Ex. I at 113.

[15] *Id.* at 114.

[16] As defendants explain, this is important because physicians are not reimbursed as much from Medicaid as they are from health insurance companies.

[17] *Id.,* Ex. E at 61, 70 (Forbes Dep.)

[18] Pl's. Mot. Summ. J., Ex. 1 at 62, 121-22 (Finan Dep.)

[19] Forbes' Br. in Supp. of Resp. to Mot. Summ. J., Ex. F at 61-2.

was extremely high. Dr. Finan testified his practice was 75% Medicaid patients.[20] Plaintiff Methodist's own breakdown of the numbers of patients admitted by the doctors from the time the started practicing until they left show over 67% Medicaid patients for Forbes and 63% for Finan.[21]

Drs. Forbes and Finan claim Rooney also misrepresented that the referral base was very good from family practice physicians in Paragould and they were going to do well. Drs. Forbes and Finan testified that the great majority of non-Medicaid patients with health insurance went to the OB/GYNS in Jonesboro. Dr. Forbes testified Rooney told him the patients were leaving because of Smith but things would improve once he and Finan got to town. He said other physicians were happy they were coming, and he spoke to a couple of physicians who said people were going to Jonesboro because of lack of choice, but if he came, patients would stay.[22] Dr. Forbes testified he learned after the first year or so that the largest family practice group in Paragould is owned by a competing hospital in Jonesboro. [23] Dr. Finan testified that he believed the Paragould physicians were referring only Medicaid patients to him and Forbes and Methodist knew or should have known that was going to happen. He also said that if Smith's behavior was the reason patients had been referred to Jonesboro, then his and Forbes coming to town should have changed that pattern. He said he relied on Rooney to predict what would happen when they got to Paragould, but after practicing there for two years, he now knows referral patterns were not going to change.[24] Dr. Finan also testified there were a couple

---

[20]*Id.*, Ex. D at 50.

[21]*Id..,* Ex. H.

[22]*Id.,* Ex. E at 61-3, 49-50 (Forbes Dep.)

[23]*Id.,* at 52-3, 94-6.

[24]*Id.,* Ex. D at 52-7, 62, 76-7, 119-20 (Finan Dep.)

doctors in Jonesboro who agreed with Rooney that the referral pattern would change if Finan were in Paragould.[25]

Plaintiff Methodist argues that because the alleged misrepresentations are statements of opinion as to future events, such statements do not constitute fraud; that "puffing" does not constitute fraud; that there is no evidence from which a reasonable jury could find that Rooney knew that his alleged statements were false at the time they were made; and that defendants waived any fraud claims by extending their contracts. Plaintiff Methodist also states that defendants have the same access to information regarding the numbers and percentages of citizens in any specific county in Arkansas who receive Medicaid assistance for OB/GYN care as Methodist.[26]

In *Grendell v. Kiehl,* 723 S.W.2d 830, 832-33 (Ark. 1987), the court recognized the difficulty of distinguishing between misrepresentation of fact and expression of opinion. The *Grendell* court cited Prosser & Keeton, Torts, § 109, 5th ed. 1984:

> It is stated very often as a fundamental rule in connection with all the various remedies for misrepresentation, that they will not lie for mistatement of opinion, as distinguished from those of fact. The usual explanation is that an opinion is merely an assertion of one man's belief as to a fact, of which another should not be heard to complain, since opinions are matters 'of which many men will be of many minds, and which is often governed by whim and caprice. Judgment and opinion in such case, implies no knowledge.'

Prosser goes on to state:

> But this explanation is scarcely adequate, since an expression of opinion is itself always a statement of at least one fact - the fact of the belief, the existing state of mind, of the one who asserts it. The true reason lies rather in the highly individualistic attitude of the common law toward the bargaining transactions with which the law of

---

[25] *Id.* at 124-5.

[26] *See* Pl's. First Supp. to Reply, Ex. D.

>   deceit has developed.  The parties are expected to deal at arm's length and to beware of one another, and each is supposed to be competent to look after his own interests, and to draw his own conclusions.  So long as he has not been misled by positive statements of fact, he has no right to rely upon the judgment of his opponent.  Justifiable reliance, of course, is essential to any form of relief for misrepresentation.  It is more correct to say, therefore, that a statement of opinion is a representation of fact, but of an immaterial fact, on which the law will not permit the opposing party to rely.  When, for any reason, such reliance is regarded as reasonable and permissible, a misstatement of opinion may be a sufficient basis for relief.

*Id.* at 755.

The Kiehls sued their insurance agent, Grendell, claiming he made fraudulent representations in promoting their investment in an oil and gas lease.  According to the evidence, Grendell told them it was "a good thing," and would "make money" for them.  Mrs. Kiehl testified Grendell "guaranteed" they would make a lot of money and would get "50 barrels a day."  The court held that there was insufficient evidence to show that Grendel knew the assurances he made were false or made factual representations while lacking knowledge of their truthfulness.  The court said "[e]ven at its strongest, the proof constitutes expressions of opinion in the nature of 'puffing.'" 723 S.W.2d at 832-33.

In *Delta School of Commerce, Inc. v. Wood,* 766 S.W.2d 424 (Ark. 1989), a student sued a vocational school and its president, Steve McCray, for fraudulent inducement of enrollment in a nursing program. According to the testimony at trial, in response to her question, McCray told her that a nursing assistant is not the same thing as a nurse's aide.  He also told her that licensed practical nurses ("LPNs") were being phased out in Arkansas and that nursing assistants would be taking the place of the LPNs.  He told her she would not "get rich as a nursing assistant" but that the pay would be comparable to that of an LPN.  Ms. Wood enrolled at the school the next day but dropped out after completing seven months of the eight-to-nine month course because she discovered she was studying

to be a nurse's aide. Although McCray denied telling Wood LPNs' were being phased out, he did state that the question of whether or not LPNs are being phased out keeps coming up.

The school argued on appeal that the representations in question were expressions of opinion and predictions of future events, not representations of fact and, therefore, not actionable. In affirming the jury's verdict in favor of Wood, the court held:

> In general, an expression of opinion, i.e. a statement concerning a matter not susceptible of accurate knowledge, cannot furnish the basis for a cause of action for deceit or fraud. However, an expression of opinion that is false and known to be false at the time it is made is actionable. The general rule only applies where the person expressing his or her opinion does so in good faith.
> . . .
>
> In the case at bar, the statements made by McCary to Wood . . . were representations of fact, not expressions of opinion. Unlike the loose general statements made by sellers in commending their products which we found to be expressions of opinion in *Grendell* . . ., the statements made by McCray were specific and definite

766 S.W.2d at 427. As to their contention that the statements by McCray were not actionable because they were predictions of future events, the court stated:

> In general, an action for fraud or deceit may not be predicated on representations relating solely to future events. However, the general rule is inapplicable if the person making the representation or prediction knows it to be false at the time it is made.
> . . .
> The statements in question were not predictions of future events, but statements of existing situation. Moreover, even if the statements were considered to be predictions, the appellants would still be liable if McCray believed them to be false when he made them to Wood.

*Id.* "It has often been held that the issue of intent is a question of fact." *Undem v. First Nat'l Bank,* 879 S.W.2d 451, 454 (Ark. 1994).

The statements at issue in the case before the Court, i.e. Smith will be leaving Paragould; the ratio of Medicaid patients to insured/self-insured is uncharacteristically high but should go down; there

14

is a "carriage trade" now but that should change, were representations of fact not opinion. They were specific and definite. They are also more in the nature of statements of the existing situation rather than predictions of the future. Further, the Court finds that there is evidence from which a reasonable jury could find that even if they were expressions of opinion, Rooney led defendants to believe that he had information, confidential information, that Smith would be leaving Paragould. There is also evidence that Rooney knew that referrals were going to Jonesboro not because of Smith but because of the relationship between the largest group of family physicians in Paragould and a competing hospital in Jonesboro. Further, there is evidence that high percentage of Medicaid patients again was not connected to Smith's troubles but was a historical fact, and Rooney knew this to be the case.

## Conclusion

Because the Court finds there are genuine issues of material fact in dispute, the motions for summary judgment are denied.

SO ORDERED this 17th day of October 2005.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE